## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**SONYA L. HENDERSON,**
        **Plaintiff,**

**v.**                                                    **Case No. 3:10cv535/RV/CJK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
        **Defendant**.

---

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and Northern District of Florida Local Rules 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381-83.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner therefore should be affirmed.

## PROCEDURAL HISTORY

On February 7, 2007, Sonya L. Henderson (who will be referred to by name, as plaintiff, or as claimant) protectively filed an application for supplemental security

income, alleging disability beginning December 22, 2006. T. 188. Claimant's application was denied initially on May 10, 2007, and upon reconsideration on September 12, 2007. T. 140-41.[1] Claimant appealed and filed a written request for a hearing, which was held before an administrative law judge ("ALJ") on October 27, 2009. T. 65-79. Plaintiff appeared and testified at the hearing, amending the alleged onset date to February 7, 2007. T. 30. Impartial vocational expert Sheila G. Justice also testified. In a decision dated November 9, 2009, the ALJ found that plaintiff had not been under a disability, as defined in the Social Security Act, since January 25, 2007, the date the application was filed. T. 12-21. The Appeals Council of the Social Security Administration denied plaintiff's request for review on October 21, 2010. T. 1-3. The ALJ's decision thus stands as the final decision of the Commissioner and is now subject to review in this court pursuant to section 1383(c) of the Act.

FINDINGS OF THE ALJ

In her written decision the ALJ made several findings relative to the issues raised in this appeal:

1. Claimant has not engaged in substantial gainful activity since January 25, 2007, the application date.

2. Claimant has the following severe impairments: history of polysubstance abuse, alcohol dependence, depressive disorder, and borderline intellectual functioning.

---

[1] The administrative record, as filed by the Commissioner, consists of 13 volumes (docs. 7 through 7-12), and has 480 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number.

3.  Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  Claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  claimant is limited to work which will only require her to understand, remember, and carry out routine, simple, one- and two-step tasks.  Claimant is limited to work which will provide her more than average, but only non-confrontational, supervision.  Claimant is limited to work which will allow her to work independently (but she can work in the presence of co-workers).  Claimant is limited to work which will have few changes in the work setting.

5.  Claimant has no past relevant work.  Claimant was born on July 3, 1966, and was 40 years old, which is defined as a younger individual age 18–44, on the date the application was filed.  Claimant has a limited education and is able to communicate in English.  Transferability of job skills is not an issue because claimant does not have past relevant work.

6.  Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform.

7.  Claimant has not been under a disability, as defined in the Social Security Act, since January 25, 2007, the date the application was filed.

<u>STANDARD OF REVIEW</u>

"Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a

result of the application of proper legal standards." *Olds v. Astrue*, No. 5:09cv319/RS/EMT, 2011 WL 691595, at *1 (N.D. Fla. Jan. 19, 2011); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, she is not disabled.

2.   If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.   If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.   Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512.  "If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Olds*, 2011 WL 691595, at *2.  "If the Commissioner carries this burden, the claimant must then prove [she] cannot perform the work suggested by the Commissioner." *Id.*

### FACT BACKGROUND AND MEDICAL HISTORY[2]

Plaintiff was born on July 3, 1966, making her 40 years of age on January 25, 2007, the date the application was filed.  T.  445.  Claimant has completed the 11th grade and is able to communicate in English.  T. 36.  Alleging disability beginning February 7, 2007, plaintiff cites a history of depression, bipolar disorder, epilepsy, and seizure disorder.  T. 206, 264.  Claimant reported no past relevant work.  T. 20, 210, 244.

On April 15, 2005, plaintiff was admitted involuntarily to the crisis stabilization unit at Lakeview Center, a behavioral health treatment center.  Mrs. Henderson was evaluated the next day by Dr. Kaberi Samanta, M.D., who documented a long history of alcohol abuse.  Dr. Samanta diagnosed substance-induced mood disorder and dysthymic disorder with anxiety, but found no acute medical problems.  T. 363-64.  Claimant was discharged on April 19, 2005, when she was also examined by Dr. Cynthia Javellana, M.D.  Dr. Javellana ruled out dysthymic disorder with anxiety, but agreed that plaintiff has substance-induced mood disorder secondary to alcohol and other substance abuse.  Plaintiff was prescribed Lexapro, an antidepressant.

After trying to overdose with pills, claimant was again admitted involuntarily to Lakeview Center on May 1, 2005.  Dr. Javellana saw plaintiff and assessed alcohol dependence and personality disorder, stressing that she minimizes her substance abuse problems.  T. 367-68.  Having completed a detoxification protocol for alcohol, Mrs. Henderson was discharged on May 4, 2005.  T. 369.  On June 1, 2005, claimant

---

[2] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, this synopsis of medical evidence will be supplemented as called for in the Analysis section.

returned to Dr. Javellana for a scheduled evaluation.  Plaintiff denied any history of seizure disorder at this time, and Dr. Javellana prescribed Wellbutrin in place of the Lexapro.  T. 371.  Dr. Javellana met with Mrs. Henderson one month later, at which time claimant admitted that she was still drinking.  Dr. Javellana emphasized to plaintiff that her "mental diagnosis is mainly secondary to [the] substance abuse problem, which is alcohol."  T. 372.  During a follow-up visit on October 24, 2005, Mrs. Henderson questioned whether she wanted to quit drinking and conceded that she had not been compliant with her medications.  T. 373.

Dr. Javellana next saw claimant on January 1, 2006, when claimant reported that she had been sober since her previous evaluation.  Dr. Javellana diagnosed alcohol dependence, in early remission.  T. 374.  Plaintiff returned to Lakeview Center for an evaluation on September 19, 2006.  Mrs. Henderson stated that she had been sober for more than two months, and Dr. Javellana determined that her cognitive functions were within normal range.  T. 375.  On March 13, 2007, claimant saw Dr. Javellana for another evaluation.  Plaintiff reported that she had been hearing voices, prompting Dr. Javellana to assess major depressive disorder, mild to moderate, recurrent with psychotic symptoms.  T. 376.  Dr. Javellana resolved to continue Mrs. Henderson on Wellbutrin.

On April 26, 2007, claimant saw Dr. Richard E. Doll, Ph.D., for a general clinical evaluation with mental status and general intellectual evaluation.  T. 378-82.  To aid in the assessment process, the Wechsler Adult Intelligence Scale – Third Edition ("WAIS-III") was administered.  Plaintiff presented with complaints of depression and stated that she did not enjoy "being around a lot of people . . . ."  Mrs. Henderson also complained that "involuntary rocking" did not allow her to work.

Claimant reported a history of enrollment in special education/ESE classes, but no other significant academic history.  T. 378.  Denying any history of traumatic brain injury or seizures, plaintiff asserted that she had been treated for suicide attempts in 2004 and depression ever since.  T. 379.

After conducting the mental status examination, Dr. Doll determined that Mrs. Henderson's "thought processes suggested a verbal intelligence to be approximately in the below average range."  T. 379.  Dr. Doll then administered the WAIS-III, which resulted in a verbal I.Q. of 70, performance I.Q. of 77, and full scale I.Q. of 71. The full scale result, according to Dr. Doll, places claimant in the "borderline intellectual functioning range."  T. 380.  Regarding her daily functioning, plaintiff stated that she requires no assistance to go grocery shopping, prepare meals, or clean the house.  According to Dr. Doll, Mrs. Henderson is independent for the basic activities of daily living, including bathing, grooming, and dressing.  T. 380.

In assessing claimant's functional ability, Dr. Doll found that she exhibited adequate concentration and is able to follow simple two-step commands.  Dr. Doll observed that neither her pace nor persistence with daily activities is impaired, and concluded that plaintiff's "ability to tolerate the mental demands associated with working appears to be fair."  Further, Dr. Doll observed that Mrs. Henderson is goal-directed when performing specific tasks and is able to maintain concentration to see tasks through to completion without supervision.  T. 381.  Based on the above information, Dr. Doll diagnosed alcohol dependence, in early remission, depressive disorder, NOS (by history), and borderline intellectual functioning. Nevertheless, Dr. Doll characterized as "fair" claimant's ability to sustain concentration and do work-

related activities "as they relate to capacity for understanding and memory." Dr. Doll recommended continued psychopharmacological treatment.  T. 381.

On May 9, 2007, Dr. Suzanne Zoss, Ph.D., completed a Psychiatric Review Technique, diagnosing plaintiff with depressive disorder NOS, borderline intellectual functioning, personality disorder NOS, and alcohol dependence in (reported) early remission.  T. 383-96.  Dr. Zoss observed moderate difficulties in maintaining concentration, persistence, or pace, but no episodes of decompensation. T. 393.  On May 10, 2007, Dr. Zoss performed a mental residual functional capacity assessment. T. 397-400.  After reviewing the functional data, Dr. Zoss opined that Mrs. Henderson can understand and remember simple instructions, work-like procedures, and locations.  Though claimant experiences difficulty with detailed instructions, according to Dr. Zoss she can make simple decisions and complete a normal workweek at an acceptable pace.  Noting that continued use of alcohol would have an overall adverse impact on function, Dr. Zoss determined that plaintiff "retains the ability to perform simple repetitive tasks on a sustained basis" and that her mental development index "should not be a barrier to competitive employment."  T. 399.

On September 11, 2007, Wendy Silver, Psy.D., performed a second mental residual functional capacity assessment.  T. 401-04.  Dr. Silver concurred with Dr. Zoss, asserting that Mrs. Henderson "is capable of remembering , understanding and following simple instructions," but "would have difficulty with more complex tasks." T. 403.  Overall, Dr. Silver concluded that claimant, with some supervision, is capable of understanding and following a schedule and performing simple, routine activities.  T. 403.  Dr. Silver also completed a Psychiatric Review Technique on the same date, diagnosing plaintiff with borderline intellectual functioning, depressive

disorder by history, and alcohol dependence in early remission.  T. 404-18.  Despite Mrs. Henderson's indication that she operates under a learning disability, Dr. Silver found "no evidence of significant intellectual deficits."  T. 417.

On September 23, 2008, claimant was seen at the Baptist Hospital emergency room, where she complained for the first time of seizure-like activity.  T. 425.  A CT scan was performed that day, revealing no abnormal areas of attenuation to suggest mass, infarct, or hemorrhage; no acute process was identified.  Because the study was limited by motion artifact, a follow-up MRI was recommended.  T. 427.  A CT angiogram of the brain was also performed, revealing no focal enhancing lesions or aneurysms.   The interpreting technician indicated that Mrs. Henderson was experiencing seizures.  T. 428.

Claimant saw neurologist Daniel E. Ross, D.O., on October 9, 2008, at the Emerald Coast Center for Neurological Disorders ("ECCND").  T. 465-68.  In his treatment notes, Dr. Ross stated that plaintiff experienced her first seizure on September 23, 2008, but denied other focal neurologic signs or symptoms.  T. 465.  Dr. Ross assessed seizure disorder, ordered an EEG, and prescribed Dilantin, an anti-seizure medication.  T. 467-68.  David Bear, D.O., also affiliated with ECCND, interpreted the EEG, which revealed diffuse slowing.  Dr. Bear, however, identified no focal, lateralizing, or epileptiform activity, and Dr. Ross concluded that the EEG was within normal limits.  T. 469, 473.  On October 30, 2008, Mrs. Henderson followed up with Dr. Ross, who noted that claimant, by her own admission, continued to "drink alcohol abundantly, several six packs per week."  Dr. Ross advised plaintiff that alcohol use is a contraindication for Dilantin.  T. 472.

On February 5, 2009, claimant started drinking and experienced a seizure soon after.  Plaintiff was taken to the emergency room, where she was combative and tried to choke herself.  As a result, claimant was admitted again to the crisis stabilization unit at Lakeview Center, where she was examined by Dr. Javellana.  T. 455-57, 460-61.  On February 24, 2009, Dr. Javellana diagnosed alcohol dependence, cocaine abuse, and seizure disorder.  T. 458.  Dr. Evelyn Manreal, M.D., examined plaintiff on February 28, 2009, observing that plaintiff minimizes her drinking and that any hallucinations she experiences are "probably related to alcohol use . . . ." T. 456.  Dr. Manreal diagnosed, *inter alia*, alcohol-induced mood disorder and a history of seizures.  T. 456.  Plaintiff returned to Dr. Javellana on March 2, 2009, when Dr. Javellana also noted that Mrs. Henderson continued to minimize her alcohol problem.  Dr. Javellana discharged claimant with instructions to follow up with Dr. Samanta and continue Dilantin.  T. 453.

On March 3, 2009, plaintiff reported to Dr. Ross that she was experiencing approximately three seizures per month and, due to financial constraints, did not start taking Dilantin until February 2009.  T. 473.  Dr. Ross described the seizures as "tonic-clonic seizure activity associated with loss of bladder control."  T. 473.  Mrs. Henderson also complained of headaches and auras, sensations preceding the seizures in which her surroundings turn yellow.  Claimant stated that the headaches, accompanied by minimal nausea and vomiting, began around November or December 2008.  Plaintiff, however, denied any focal neurologic symptoms associated with the headaches.  T. 473.  Dr. Ross assessed seizure disorder and common migraines, concluding that plaintiff's neurologic exam remained stable.  T. 475.  Dr. Samanta

examined plaintiff on April 15, 2009,  and noted that Mrs. Henderson had a blood-alcohol level of .390 when she was seen at the emergency room in early February. Claimant asserted that she could not afford to pay for her anti-seizure medication, which had been changed by Dr. Ross to Depakote, prompting Dr. Samanta to refer her to Psychiatric Support.  T. 448-49.

Dr. Bear saw plaintiff on April 23, 2009, for a neurologic reevaluation regarding possible seizures. T. 476-78. Mrs. Henderson reported that she could not afford to pay for Depakote and had not been taking any anti-seizure medication since her last visit with Dr. Ross.  Claimant still denied any other neurologic signs or symptoms such as hemisomal numbness, weakness, or tingling.  T. 476.  Dr. Bear provided plaintiff additional prescriptions for Depakote and Hydroxyzine (for her headaches), with instructions to obtain paperwork from the Epilepsy Foundation to determine whether the agency might pay for her medications.  T. 478.

<u>HEARING BEFORE THE ALJ</u>

The administrative hearing commenced on October 27, 2009, with the testimony of Mrs. Henderson, who asserted that she does not drive because of her seizure disorder. T. 35-36.  Notwithstanding her previous employment as a grocery store cashier, claimant stated that she is unable to do simple math like adding, subtracting, or making change.  T. 37.  Plaintiff, who complained of at least one seizure per week, conceded that physicians had told her the seizure disorder is alcohol-related and that alcohol "brings them on . . . ." T. 39.  Mrs. Henderson stated that she stopped drinking after her first seizure in September 2008.  The ALJ, however, cited medical records from November 2008, when claimant's father

reported that she "continue[s] to drink alcohol abundantly."  T. 39-40.  Plaintiff denied any dependence on cocaine, which she last used in February 2009.  T. 41.

Mrs. Henderson explained that on a typical day she sleeps until 1:00 or 2:00 p.m., because of her medications.  T. 43.  After waking, claimant watches television and naps.  T. 44.  Claimant stated that she rarely helps with the household chores and does not cook, but does do her own laundry.  T. 44-46.  When questioned by her attorney, plaintiff clarified that she stopped drinking in September 2008 after the initial seizure, but "fell off the wagon" temporarily in February 2009.  T. 47-48.  Mrs. Henderson testified further that she still has difficulty obtaining Depakote and cannot manage her own funds.  T. 48-49.  According to Mrs. Henderson, she was employed part-time from 1990 to 1998 in the cafeteria at an elementary school, where her job required her to "put the trays through the dishwasher . . . ."  T. 50.  Claimant asserted that she generally recovers from a seizure episode in about ten minutes, but is so tired that she then lays down for two or three hours.  T. 51.

The ALJ then inquired of vocational expert Sheila G. Justice as to claimant's work prospects:

> I'd like you to assume an individual of the same age, educational background as the claimant with the same work history.  I'd like you to further assume that this hypothetical individual has capabilities and limitations. . . . I'd like for you to look at exhibit 8F page 3.  I'd like you to assume the capabilities and limitations as stated therein.  Capable of remember[ing], understanding and follow[ing] simple instructions; would have difficulty with more complex tasks; capable of understanding and following a schedule, however, may require some supervision . . . .

T. 56-57.  The ALJ asked Ms. Justice whether she could "identify any jobs in the national or regional economy that such an individual, with that given vocational profile would be able to perform[.]"  T. 57.  Citing jobs like dishwasher, laundry worker, and circuit board assembler, Ms. Justice answered in the affirmative, explaining that such an individual "would be limited to lower level, unskilled work." T. 57.  The ALJ posed a second hypothetical, asking Ms. Justice whether she could identify any national or regional jobs for an individual with the capabilities and limitations as set forth in exhibit 11F, a mental residual functional capacity assessment performed by Dr. Javellana.   T. 57-58.   In light of the "marked limitations" observed by Dr. Javellana, Ms. Justice could identify "no work available in the national or regional economies this individual could perform."  T. 58.

Claimant's attorney subsequently raised the issue of Mrs. Henderson's I.Q., questioning Ms. Justice as to whether an individual with a full scale I.Q. of 69 and the capabilities and limitations as set forth in exhibit 8F could find work in the national or regional economies.   Ms. Justice replied, "Probably not, under, under strict supervision, maybe, and more of a sheltered environment, but probably not at 69." T. 59.  At a full scale I.Q. of 70, however, Ms. Justice testified that "it's borderline": "It's difficult to answer.  Some people with an IQ in that range could, some people couldn't.  It would to a great extent depend on the job, depend on the employer, depend on if there was a production rate involved."  T. 59.  Given no production rate and a low stress environment, Ms. Justice opined that "it would be a great deal more likely."  T. 59.

ANALYSIS

Plaintiff raises three issues in this appeal, arguing (1) the ALJ improperly rejected Dr. Ross's diagnosis of seizure disorder; (2) the ALJ failed to pose to the vocational expert a hypothetical accounting for seizure disorder as a limitation; and (3) the ALJ failed to consider the alleged seizure disorder in combination with  Mrs. Henderson's valid verbal I.Q. score.  Generally speaking, claimant maintains that the ALJ's decision should be reversed because, she contends, it is not supported by substantial evidence.

Claimant contends first that the ALJ erred by failing to establish good cause for rejecting the seizure disorder diagnosis of Dr. Ross, one of plaintiff's treating neurologists.  Plaintiff complains that the ALJ, in so doing, impermissibly substituted her own opinion for that of a medical expert.  As articulated above, the Commissioner analyzes a disability claim in five sequential steps.  *See* 20 C.F.R. § 416.920(a)(1). At step two of the analysis, the ALJ must determine whether the claimant has "a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement . . . ."  *See* 20 C.F.R. § 416.920(a)(4)(ii).  An impairment is "severe" when it "significantly limit[s] [the claimant's] physical or mental ability to do basic work activities."  *See* 20 CFR § 416.921(a).

Though the impairment need not be disabling to be considered severe, a severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  *See* 20 CFR § 416.908.  In other words, "[a] [severe] physical

or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms . . . ." *Id.*  Significantly, the burden is on the claimant to prove that she is disabled and, by necessary implication, that an impairment or combination of impairments is "severe." *See Doughty v. Apfel*, 245 F.3d 1274, 1278, 1280 (11th Cir. 2001) (noting that "the overall burden of demonstrating the existence of a disability as defined by the Social Security Act '[u]nquestionably' rests with the claimant" (quoting *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999))).

In making the step two analysis, the ALJ here found that plaintiff's severe impairments include a history of polysubstance abuse, alcohol dependence, depressive disorder, and borderline intellectual functioning.  T. 14.  In contrast, the ALJ found claimant's alleged seizure disorder to be "a non-medically determinable impairment[,]" because, the ALJ concluded, "it appears to be based entirely on the claimant's subjective complaints/allegations."  T. 14.  Having reviewed the record in its entirely, the court determines that the objective, medically acceptable evidence confirms the ALJ's interpretation.

The record documents that claimant first complained of seizure-like symptoms on September 23, 2008, when she was seen at  the Baptist Hospital emergency room. A CT scan of the head, though somewhat limited by motion artifact, revealed no "abnormal areas of attenuation . . . to suggest mass, infarct, or hemorrhage."  T. 427. The interpreting radiologist or technician, Richard S. Samuels, determined that the "ventricles and CSF spaces [were] within normal limits" and identified no abnormal extra axial fluid collections.  T. 427.  In short, Samuels identified no acute process.

T. 427.  A CT angiogram of the brain also failed to demonstrate pathology.  The interpreting radiologist or technician, Edwin L. Rivera, identified no aneurysms or focal enhancing lesions in the brain, characterizing the appearance of the intracranial arteries as "unremarkable."  T. 428.  Rivera opined further that enhancements of the cerebral arteries were normal.  T. 428.  The radiographic evidence thus did not reveal any signs of acute disease like seizure disorder.

Nor does the history of Mrs. Henderson's treatment at the Emerald Coast Center for Neurological Disorders offer objectively determinable medical evidence of a seizure disorder.  An October 2008 EEG revealed no focal, lateralizing, or epileptiform activity, and Dr. Ross determined that the test was within normal limits. T. 469, 473.  Notwithstanding some complaints of headaches and auras, claimant repeatedly denied any other focal neurologic signs or symptoms over the course of several physical evaluations.  T. 465, 473, 476.  Dr. Ross described plaintiff's neurologic exam as "stable" after her last documented examination with that neurologist.  T. 475.  Despite multiple mention of seizure disorder, the totality of the objective evidence is therefore consistent:  claimant, according to the medically acceptable clinical and laboratory diagnostic techniques, is neurologically intact.

Significantly, the burden rested at all times with Mrs. Henderson to identify evidence of record tending to confirm the impairment alleged.  *See Doughty*, 245 F.3d at 1278, 1280.  In her supporting memorandum, claimant could point to no objectively determinable medical evidence tending to establish a neurologic pathology like seizure disorder.  (Doc. 13, 3-4)  Leaving open the possibility that plaintiff does indeed suffer from the additional severe impairment of seizure disorder,

the court cannot disturb the findings of the ALJ where, as here, those findings are supported by substantial evidence and are the result of properly applied legal standards.  *See Carnes*, 936 F.2d at 1218.

As a corollary, claimant contends next that the ALJ, by declining to credit the alleged seizure disorder as a severe impairment, failed to pose a complete and accurate hypothetical to the vocational expert.  Plaintiff reasons that the testimony of the vocational expert is not supported by substantial evidence because the ALJ, who acknowledged some limitation in the ability to perform a full range of work, failed to elicit vocational testimony contemplating the limitations associated with seizure disorder.  (Doc. 13, 4-5)

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).  The ALJ, however, is "not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."  *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).  As Mrs. Henderson now argues, the ALJ did not direct the vocational expert to consider the alleged seizure disorder when rendering an opinion as to claimant's vocational prospects.  But, having properly discounted the seizure disorder as a severe impairment under step two of the sequential evaluation analysis, the ALJ was not required to include that impairment as part of the hypothetical posed to the vocational expert.  *See Crawford*, 363 F.3d at 1161.  Accordingly, the court finds no deficiency in the hypotheticals as relayed to the vocational expert, whose testimony is supported by substantial evidence.

Finally, claimant argues that the ALJ, in contravention of 20 C.F.R. Part 404, Subpart P, Appendix 1, failed to consider the alleged seizure disorder in combination with claimant's valid verbal I.Q. score.  Plaintiff directs the court's attention to section 12.05(C) of 20 C.F.R. Part 404, Subpart P, Appendix 1, under which a claimant will be found disabled by reason of mental retardation if she establishes, *inter alia*, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]"  Mrs. Henderson argues that the alleged seizures pose a significant work-related limitation of function and should have been considered accordingly in the ALJ's section 12.05(C) analysis.  (Doc. 13, 6-7)

As already established by analysis of plaintiff's first point, the ALJ properly discredited the alleged seizure disorder as a severe impairment.  As a result, the court finds no error in the omission of this impairment in the consideration of disability under section 12.05(C).  For purposes of her argument on this issue, claimant assumes that her valid verbal I.Q. score of 70 satisfies the first element of section 12.05(C). (Doc. 13, 7)  In determining that plaintiff's combination of impairments does not meet the listing in section 12.05(C), however, the ALJ did not base her conclusion on the absence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]"  Rather, the ALJ concluded that Mrs. Henderson does not exhibit the sort of "significantly subaverage general intellectual functioning" contemplated by section 12.05(C).  T. 17.

"Listing 12.05 'contains an introductory paragraph with the diagnostic description for mental retardation.'"  *Harris v. Comm'r of Soc. Sec.*, 330 F. App'x

813, 815 (11th Cir. 2009) (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1, §
12.00(A)).  According to that paragraph, "[mental retardation refers to significantly
subaverage general intellectual functioning with deficits in adaptive functioning
initially manifested during the developmental period; *i.e.*, the evidence demonstrates
or supports onset of the impairment before age 22."  20 C.F.R. Part 404, Subpart P,
Appendix 1, § 12.05.  "The impairment must satisfy the diagnostic description in the
introductory paragraph and any one of the four sets of criteria described in section
12.05 to meet the listing requirements."  *Harris*, 330 F. App'x at 815; *see also*
*Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997) ("To be considered for
disability benefits under section 12.05, a claimant must at least (1) have significantly
subaverage general intellectual functioning; (2) have deficits in adaptive behavior;
and (3) have manifested deficits in adaptive behavior before age 22.").

Though "IQ tests create a rebuttable presumption of a fairly constant IQ
throughout [the] life" of a disability claimant, *Hodges v. Barnhart*, 276 F.3d 1265,
1268-69 (11th Cir. 2001), "a valid I.Q. score need not be conclusive of mental
retardation where the I.Q. score is inconsistent with other evidence in the record on
the claimant's daily activities and behavior."  *Lowery v. Sullivan*, 979 F.2d 835, 837
(11th Cir. 1992); *see also Hodges*, 276 F.3d at 1269 (holding that the Commissioner
may present evidence of claimant's daily life to rebut presumption of mental
impairment that arises when claimant presents a valid I.Q. score of 60 to 70 and
evidence of additional mental or physical impairment).

In this case, the evidence surveyed by the ALJ supports the conclusion that
Mrs. Henderson does not labor under significantly subaverage general intellectual

capabilities.  Claimant attended a consultative examination with Dr. Doll on May 3, 2007.  Dr. Doll administered the WAIS-III, which resulted in a verbal I.Q. of 70, performance I.Q. of 77, and full scale I.Q. of 71.  Though claimant registered a verbal I.Q. within the range of retardation as set forth in section 12.05(C), Dr. Doll determined that the full scale result places claimant in the borderline intellectual functioning range.  According to Dr. Doll, plaintiff "is independent for basic activities of daily living, including bathing, grooming, and dressing[,]" and "requires no assistance" in performing tasks like grocery shopping, preparation of meals, and household cleaning. T. 380.  Mrs. Henderson added through testimony that she does her own laundry. T. 44-46.  The evidence of claimant's daily life thus serves to rebut the presumption of mental impairment. *See Hodges*, 276 F.3d at 1269; *Lowery*, 979 F.2d at 837.  Moreover, the court is persuaded by plaintiff's prior work history that she is not mentally retarded.  Mrs. Henderson, who was employed seven years in a school cafeteria and another three years at a Subway restaurant, simply does not exhibit subaverage general intellectual functioning with deficits in adaptive functioning. *See Messier v. Astrue*, No. 1:09-cv-00092-MP-AK, 2010 WL 3238929, at *5 (N.D. Fla. Aug. 12, 2010) ("When a plaintiff has worked with an impairment over a period of years, the ALJ may properly consider the condition not disabling, absent a showing that the condition had significantly deteriorated.").

Various other observations and findings of Dr. Doll lend further support to the conclusion that claimant demonstrates a higher level of adaptive functioning than that which is required to meet the listing of section 12.05(C).  Dr. Doll ultimately

described a person whose "ability to do work related activities as they relate to capacity for understanding and memory appears to be fair":

> This woman exhibited adequate concentration during the interview. She is able to follow simple two-step commands. . . . Her persistence with daily activities is not impaired. Her pace with daily activities is not impaired. Her ability to tolerate the mental demands associated with working appears to be fair. Her activities do appear to be self-initiated. When performing specific tasks, her behavior does appear to be goal directed and she is able to maintain concentration to see tasks through to completion without supervision. Her level of overall personal independence is judged to be good.

T. 381.

The opinions Drs. Zoss and Silver, both of whom performed a Psychiatric Review Technique and mental residual functional capacity assessment, confirm Dr. Doll's findings. Diagnosing plaintiff with borderline intellectual functioning, Dr. Zoss opined that Mrs. Henderson can understand and remember simple instructions, work-like procedures, and locations. Dr. Zoss asserted further that claimant can make simple decisions and complete a normal workweek at an acceptable pace. Noting that continued use of alcohol would have an overall adverse impact on function, Dr. Zoss determined that plaintiff "retains the ability to perform simple repetitive tasks on a sustained basis" and that her mental development index "should not be a barrier to competitive employment." T. 399.

Dr. Silver made similar observations, asserting that Mrs. Henderson "is capable of remembering , understanding and following simple instructions," but "would have difficulty with more complex tasks." T. 403. Dr. Silver concluded that claimant, with some supervision, is capable of understanding and following a schedule and

performing simple, routine activities.  T. 403.  Assessing borderline intellectual functioning, Dr. Silver found "no evidence of significant intellectual deficits."  T. 417.  The court also observes that the evaluation of Dr. Javellana, who assessed "marked" limitations in claimant's ability to  perform complex and varied tasks, is consistent with those performed by Drs. Doll, Zoss, and Silver. T. 439. Dr. Javellana observed only "moderate" limitations in plaintiff's ability to perform simple, repetitive tasks, where "moderate" refers to a "[s]uspected impairment which doesn't affect ability to function."  T. 438-39.  Significantly, none of Mrs. Henderson's doctors diagnosed mental retardation.

Nor can the court overlook the well-documented history of claimant's alcohol abuse in considering the extent of impairments such as seizure disorder and borderline intellectual functioning.  "[R]efusal to follow prescribed medical treatment without a good reason will preclude a finding of disability."  *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (citing 20 C.F.R. § 416.930(b)).  Plaintiff testified that her doctors advised her alcohol would aggravate any seizure activity.  T. 39. When Mrs. Henderson asked Dr. Javellana to complete a residual functional capacity form in connection with her application for disability benefits, Dr. Javellana warned, "I have to qualify that [your] mental diagnosis is mainly secondary to [your] substance abuse problem, which is alcohol." T. 372.  Despite these repeated warnings and an alleged inability to afford various prescribed medications, claimant continued to drink alcohol in excess.  Dr. Ross noted in October 2008 that claimant, by her own admission, continued to "drink alcohol abundantly, several six packs per week."  T. 472.  Further, the ALJ cited medical records from November 2008, when claimant's

father reported that she "continue[s] to drink alcohol abundantly." T. 39-40. Such evidence suggests that claimant's mental impairment and reported seizure disorder are not as severe as alleged. *See Dawkins*, 848 F.2d at 1213.

In sum, claimant failed to establish that her mental impairment satisfies the introductory paragraph of listing 12.05. Accordingly, the ALJ properly determined that "the claimant does not suffer from 'mental retardation' as defined in listing 12.05 . . . ." *See Harris*, 330 F. App'x at 815; *Crayton*, 120 F.3d at 1219. Where, as here, the ALJ has conducted a thorough examination of the record and properly considered claimant's medical condition as a whole to reach a determination supported by substantial evidence, this court may not reverse the Commissioner's decision. *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

Accordingly, it is respectfully RECOMMENDED:

The application for supplemental security income be DENIED.

At Pensacola, Florida, this 9th day of November, 2011.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).